FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ROBYN MEREDITH, INC., | : | |
| H&W PARTNERSHIP, | : | Civil Action No. 05-4736 |
| ROBYN MEREDITH (H.K.) LTD., and | : | |
| ALAN WALLACE, | : | |
| | : | **OPINION** |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| DANIEL H. LEVY and | : | |
| MAUREEN D. SCHIMMENTI, | : | |
| | : | |
| Defendants. | : | |

**APPEARANCES:**

    Eric M. Wood
    Fox Rothschild LLP
    1301 Atlantic Avenue
    Midtown Building, Suite 400
    Atlantic City, NJ 08401-7212

    Attorney for Plaintiffs

    Lawrence M. Rolnick
    Emily A. Kaller
    Lowenstein Sandler PC
    65 Livingston Avenue
    Roseland, NJ 07068

    Attorneys for Defendants

**RODRIGUEZ, Senior District Judge:**

    This matter has come before the Court on Defendants' Motion to Dismiss the Complaint for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). Because Plaintiffs' claims are not actionable under the federal securities laws, Defendants' motion will be granted.

## FACTUAL BACKGROUND

This action arises from the sale of businesses and related equipment, and leases of property by Plaintiff Robyn Meredith, Inc. ("RMI") to DonnKenny Apparel, Inc. ("DKAI"). DKAI is not a party to this action, nor is DKAI's parent company, DonnKenny, Inc. ("DK"). Named as Defendants are Daniel H. Levy, former Chief Executive Officer of DK, and Maureen D. Schimmenti, former Chief Financial Officer, Vice President-Finance, Secretary, and Principal Financial and Accounting Officer of DK.

Plaintiffs allege that the Defendants fraudulently and negligently misrepresented facts concerning DK's financial condition to induce Plaintiffs to enter into long-term sales and employment contracts with DKAI in the Fall of 2003, and to accept DKAI securities. They allege that the Defendants intentionally ignored industry-accepted methods for valuing inventory in an effort to create the appearance of financial security on behalf of DKAI. In February 2005, no longer capable of meeting its financial obligations, DK filed for bankruptcy and, as a wholly-owned subsidiary of DK, DKAI entered into bankruptcy proceedings as well.

Prior to being de-listed as a result of the bankruptcy, DK had been a publicly traded company on the NASDAQ stock exchange. In the apparel wholesale business, DK financed several subsidiaries, including DKAI. In accordance with securities laws, DK filed quarterly and annual financial statements with the United States Securities and Exchange Commission ("SEC").

On October 1, 2003, RMI entered into an asset purchase agreement ("the Agreement") with DK, selling substantially all of its business to DK, through its

2

subsidiary DKAI.  The terms of the Agreement included the following:

>   (1) $3,404,363 cash consideration for assets of RMI;
>
>   (2) $1,200,000 in the form of a Note payable by DKAI over three years, also consideration for the assets of RMI;
>
>   (3) A three-year employment contract at DKAI for Plaintiff Alan Wallace, the former President and a principal shareholder of RMI, with a base salary of $300,000 per year;
>
>   (4) A three-year employment contract at DKAI for non-party Harris Snyder, a shareholder of RMI and partner of Plaintiff H&W Partnership, with a base salary of $225,000 per year;
>
>   (5) A three-year employment contract at DKAI for non-party Matthew Wallace, a shareholder of RMI, with a base salary of $275,000 per year.
>
>   (6) Assumption by DKAI of computer equipment and machinery leases to RMI, and an agreement that DKAI would lease real property from Plaintiff H&W Partnership for a three year period, at a rate of $113,850 per year.

Additionally, Defendant Levy, on behalf of DK, separately agreed that for $270,000 an affiliate of DK would assume all assets of Plaintiff Robyn Meredith (H.K.) Ltd. ("H.K."), a Hong Kong corporation established for facilitating apparel imports to the United States from China.

Before entering into the contracts described above, Plaintiff Alan Wallace allegedly performed due diligence on DKAI and DK.  He reviewed DK's Form 10-K for the year 2002 and Forms 10-Q for the first two quarters of 2003.  Each form had been filed with the SEC, and each was signed by both defendants, Daniel H. Levy and Maureen D. Schimmenti.  Plaintiffs allege that Wallace relied on the representations in the Form 10-K and Forms 10-Q when he decided to enter into the Agreement.  Further, Wallace relied upon Defendants' representation that DK practiced the "lower of cost or value" method of valuing inventory, which is customary in the apparel business and

3

required by Generally Accepted Accounting Principles (GAAP).  According to the Plaintiffs, clothing loses value at the end of each retail season.  Thus, last season's clothing ordinarily must be liquidated at prices below cost.  It follows that out of season inventory valued at cost would not provide an accurate assessment of a company's finances and worth.  Further, the more out of season the apparel is, the higher the difference would be between the reported value at cost and the actual value.  After observing substantial amounts of inventory in DK's warehouses, and after consulting his accountant, Wallace authorized Plaintiffs to enter into the Agreement.

After the Agreement closed on October 1, 2003, the principals of RMI, including Alan Wallace and Harris Snyder, joined DKAI as employees.  Wallace and Snyder, in their duties as employees of DKAI, were asked to liquidate much of DKAI's inventory in 2004 and 2005.  During that liquidation, Wallace allegedly discovered that substantially all of the back inventory consisted of previous seasons' fashions, but was valued on DK's books at cost, significantly above market value.  Further, Wallace found that DKAI had no way to value existing inventory appropriately, but valued all inventory at cost.  DKAI continued to liquidate inventory in the second half of 2004 to meet capital needs.  Plaintiffs maintain that such inventory liquidations were accompanied by product write-downs, demonstrating that the inventory was not valued at lower of cost or market.

On February 7, 2005, DK, DKAI, and other affiliated companies filed Bankruptcy Petitions in the Southern District of New York.  Payments due to Plaintiffs under the Agreement ceased at that time.

**CLAIMS AND ARGUMENTS**

The Complaint originally set forth seven counts, but in briefing the motion before the Court, Plaintiffs have withdrawn Counts IV and V[1]. The remaining claims of RMI allege I. Violations of Section 10(b) of the Exchange Act and Rule 10b-5; II. Violations of Section 18 of the Exchange Act; III. Violations of Section 20(a) of the Exchange Act; VI. Common Law Fraud; and VII. Negligent Misrepresentation. All Plaintiffs join in the last two claims.

Plaintiffs outline alleged misrepresentations made by Defendants Levy and Shimmenti as follows.

> (1) Both signed a Form 10-K on March 28, 2003, stating that the value of DK's inventory on December 31, 2002 was $15.9 million, valued at the lower of cost or market, and that current product demand was taken into account in the establishment of inventory reserves, which were sufficient to account for the actual value of inventory.
>
> (2) Similarly, on May 14, 2003, Levy and Shimmenti signed and filed a Form 10-Q for the first quarter of 2003, which stated that at March 31, 2003, DK's inventory was valued at $13,561,000, valued at the lower of cost or market, and that current product demand was taken into account in the establishment of inventory reserves, which were sufficient to account for the actual value of inventory.
>
> (3) On August 14, 2003, they signed and filed a Form 10-Q for the second quarter of 2003, which stated that as of June 30, 2003, DK's inventory was valued at $16.7 million, valued at the lower of cost or market, and that current product demand was taken into account in the establishment of inventory reserves, which were sufficient to account for the actual value of inventory. In addition, although the Form 10-Q disclosed that the company agreed to purchase in 2003 and 2004 $2.7 million of raw materials in connection with manufacturing Bill Blass coats, it did not disclose that the inventory DKAI was committed to acquire was out of style and worth significantly less than the amount DKAI agreed to pay, and DK did not maintain a reserve to cover the loss that the commitment would create.

---

[1] See Pls.' Mem. Of Law in Opp'n to Defs.' Mot. To Dismiss, p. 18 n.5.

Plaintiffs allege that Wallace relied upon these misrepresentations in deciding to enter into the Agreement and, as a result, Plaintiffs suffered losses in the value of the DKAI note and the loss of payments from DKAI.

By way of this lawsuit, Plaintiffs seek the remaining balance on the Note, $766,667, plus interest from February 2005; the remaining balance of equipment leases of $285,000, plus interest from February 2005; defaulted lease payments due to H&W Partnership, $306,166, plus interest from February 2005; the promised purchase price of H.K., $270,000, plus interest from October 1, 2003; and the unpaid amounts due under Alan Wallace's employment contract, $447,124.

The Defendants seek dismissal of the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). They claim the Plaintiffs have failed to properly allege any violation of the securities laws because the Note contained in the Agreement was not a "security." In essence, Defendants argue that Plaintiffs have attempted to transform the $1.2 million promissory note, which evidenced nothing more than a loan from RMI to DKAI, into a "security." Defendants further assert the Plaintiffs have not stated a claim for securities fraud because: (1) the allegations are of the "inactionable fraud by hindsight"; and (2) the Plaintiffs have not pleaded the requisite requirement of Defendants' scienter. In addition, Defendants have asserted that the alleged Section 18 violation is time barred under the one-year statute of limitations period, and that the common law claims fail to satisfy the pleading requirements of the Federal Rules. Finally, Defendants state that the inability to join DK and DKAI as parties to this action, because they are protected under bankruptcy laws, could prejudice DK, DKAI, and Defendants and warrants dismissal.

6

**LEGAL STANDARD**

On a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6), the court is required to accept as true all allegations in the Complaint and all reasonable inferences that can be drawn therefrom, viewing them in the light most favorable to the plaintiff. A Rule 12(b)(6) motion to dismiss should be granted if it appears to a certainty that no relief could be granted under any set of facts which could be proved. *R & J Holding Co. v. The Redevelopment Authority of the County of Montgomery*, 165 Fed. Appx. 175, 178 (3d Cir. 2006). *See also Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005). Plaintiffs must be given the benefit of every favorable inference that can be drawn from those allegations. *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir. 1991). Although consideration of facts on a motion to dismiss is typically limited to those contained in the Complaint, courts may consider authentic documents that are "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997).

**DISCUSSION**

In Count I of the Complaint, RMI alleges that Defendants made material misrepresentations or failed to disclose material facts in violation of Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and Commission Rule 10b-5 in order to acquire the assets of RMI, which DK and DKAI needed to remain solvent. RMI further alleges that it relied upon the accuracy of the Form 10-K, Forms 10-Q, and Sarbanes-Oxley Certifications filed by Defendants in acquiring securities of DKAI, which it would not have agreed to acquire if it knew DKAI's true financial condition. Similarly, in Count II, RMI contends that Defendants violated Section 18 of the Exchange Act and

7

are therefore liable for damages the Plaintiffs suffered in connection with the purchases of DKAI securities.  Finally, in Count III, RMI asserts that, as controlling persons of DK and DKAI, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

Private securities fraud actions are based upon federal securities statutes and their implementing regulations.  Section 10(b) of the Exchange Act prohibits (1) the "use or employment . . . of any deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission rules and regulations.  15 U.S.C. § 78j(b).  Rule 10b-5 makes it unlawful for "any person . . . to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b).  The courts have implied a private damages action from these statutes and Rule.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005).  A section 10(b) action's basic elements include: (1) a material misrepresentation or omission; (2) scienter, or wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; and (5) economic loss proximately caused by the plaintiff's reliance.  *Dura,* 544 U.S. at 341-42; *see also GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) (holding that to state a claim, those elements must be stated with "particularity" pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(2)).

Section 18 provides for a private right of action for damages resulting from the purchase or sale of a security in reliance upon a false or misleading statement contained in any document or report filed with the SEC pursuant to the Exchange Act.  15 U.S.C. § 78r(a).  It requires proof of reliance, but not scienter.  *In re Suprema Specialties, Inc.*

8

*Sec. Litig.*, 438 F.3d 256, 283 (3d Cir. 2006).  Section 20(a) imposes joint and several liability upon a person who controlled another person or entity which committed a primary violation of the securities laws.  *Id.* at 284.

The definition of "security" in section 3(a)(10) of the Exchange Act includes a list of financial instruments, beginning with "any note."  Although courts initially interpreted "any note" literally, classifying a note as a security has become more stringent under the test articulated by the Supreme Court in *Reves v. Ernst & Young*, 494 U.S. 56 (1990).  *Stoiber v. SEC*, 161 F.3d 745, 748 (D.C. Cir. 1998).  In *Reves,* the Supreme Court held that "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts."  494 U.S. at 63.

The Court has recognized a list of instruments that are "notes" but are not "securities."  These include "the note delivered in consumer financing," the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a character loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary cause of business.  *Reves*, 494 U.S. at 65.  *See also Exchange Nat. Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1137 (5th Cir. 1974).

In order to make a determination on instruments not specifically excluded by the Court, the "family resemblance" test was adopted.  *Id.* at 64-65.  That test begins with a presumption that every note is a security.  *Id.* at 65.  Such presumption is rebuttable, however, as the Congressional intent of creating the Securities Act was to regulate the

investment market, not to create a general federal cause of action for fraud. *Id.* Thus, four factors must be examined in order to determine whether a note is a "security." First, courts assess the motivations that would prompt a reasonable seller and buyer to enter into the transaction. *Id.* at 66. For example, if a seller of a note is attempting to raise money for general business purposes or to finance investments, and the buyer's interest is in profiting from the note, then the note is likely to be a security. Second, the courts look to the "plan of distribution" of the note to determine whether it is an instrument in which there is "common trading for speculation of investment." *Id.* Third, the reasonable expectations of the investing public are examined. *Id.* Finally, courts inquire into whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary. *Id.* at 67. Failure to satisfy one of the factors is not dispositive since they are considered as a whole. *See, eg., McNabb v. SEC*, 298 F.3d 1126, 1132-33 (9th Cir. 2002). However, if the note in question cannot satisfy <u>any</u> of the four factors, or if it is found on the list of the above enumerated "non-securities," then the note will not be classified a "security." *Reves,* 494 U.S. at 67.

There is "some necessity for fine-tuning the definition of [a] 'note' to avoid sweeping within the coverage of section 10(b) of the 1934 Act every consumer and business loan financing current operational costs." *Lino v. City Investing Co.,* 487 F.2d 689 (3d Cir. 1973). *See also Ruefenacht v. O'Hallaran,* 737 F.2d 320, 325 (3d Cir. 1984). *Lino* has been recognized as the first circuit decision holding that a particular note did not fall within the definition of a security. *Ruefenacht*, 737 F.2d at 323. There, plaintiff purchased two franchise licensing agreements. Payment was made by cash and

several promissory notes. Plaintiff contended he was induced to purchase these agreements by the material misstatements of the defendant. The defendant argued that none of the instruments involved in the transaction were "securities," and thus, the action should be dismissed. The Circuit's focus was not "whether [the plaintiff] sold securities but whether [the defendant] purchased them." *Lino*, 487 F.2d at 694. Declaring that the notes were <u>not</u> securities, the court held that "in no way" could the defendant have purchased plaintiff's notes for speculation or investment. *Id*. at 695. Further, the court reasoned that to accept plaintiff's argument would mean that "any consumer who bought an article 'on time' and issued a note [could] sue in federal court on the theory that the retailer had purchased 'his security.'" *Id*.

Another court in this circuit has found that a loan for a specific transaction in the form of a promissory note was not a security. *Bank of America Nat'l Trust & Savings Ass'n v. Hotel Rittenhouse Assoc.,* 595 F. Supp. 800, 801 (E.D. Pa. 1984). There, plaintiffs sought to recover on a promissory note and mortgage, which were executed in connection with a construction loan for a hotel-apartment-condominium project. When payments on the loan ceased, plaintiffs sought recovery and the defendant counterclaimed. Reviewing the counterclaims, the court considered whether any of the instruments involved in the sale (i.e., the note) were "securities" within the meaning of the federal securities laws. *Id*. at 804. Holding that the note in question was not a security, the court pointed out that the parties negotiated a loan for a specific real estate development project, and the loan was executed through a promissory note secured by a pledge of collateral, and that such situations are "plainly distinct from a note executed in the acquisition of general investment capital." *Id*. at 805. Further, the court found

11

persuasive that no public offering was involved and the note was given in the standard commercial context. *Id.*

There are, however, certain circumstances under which courts have recognized a note as a security. Notes sold by a broker for financing commodities trading and personal usage were deemed "securities," after the court applied the *Reves* test. *Stoiber v. SEC*, 161 F.3d 745 (D.C. Cir. 1998). There, a broker approached thirteen customers and asked to borrow various sums of money totaling $495,000. *Id.* at 747. Each customer gave the broker various amounts of money, and in return was issued unsecured promissory notes with terms of two to five years and fixed interest rates ranging from six to twelve percent. *Id.* Looking to escape securities fraud allegations, the broker argued that the promissory notes were not securities. The court applied the four-factor *Reves* test.

Under the first factor, "motivation," the court had "little trouble concluding that [the broker]'s main purpose for using the notes points in the direction of their being securities." *Id.* at 749. The customers were primarily motivated by the opportunity to earn a profit, and they knew at the time of the transactions that most of the money would be used for commodities trading. *Id.* This satisfied the court that the notes fell within the "financing substantial investments" language of *Reves*. *Id.*

The "plan of distribution" analysis also pointed in the direction that the notes were securities. Although the court recognized that none of the notes had been resold, and that thirteen customers does not constitute a "broad segment of the public," it was persuaded by the fact that the broker solicited individuals and offered little detail about the reason for his request for money (other than that the money would be used for

commodities trading).  *Id*. at 751.  Ultimately, the solicitation and trading aspects supported the court's conclusion that the notes were securities.

Declaring the third "perception" factor a "wash," the court next considered the argument that the circumstances surrounding the loans and the laws of the State of Illinois already provided adequate protection to lenders.  The lack of collateral and insurance offered to the investors influenced the court's decision that there was no adequate substitute for the protection of federal law and the court declined to expand the types of alternative protection contemplated in *Reves*.  *Id*. at 752.  Thus, the court never considered the open question of whether state law can ever be an adequate substitute under the fourth *Reves* factor.

Applying the *Reves* test to the facts of this case, the Court finds that the promissory note used as partial consideration for the sale of RMI's business to DKAI is not a security.  Like the note discussed in *Lino*, the note given to the Plaintiffs was partial payment, combined with cash, for the sale of a business.  This Court concludes, as the *Lino* court did, that "in no way" could the defendants have purchased the notes for speculation or investment.  Unlike the note in *Stoiber*, the note here was not held out as an investment to RMI, but as a loan for completing the commercial sale of business between the two parties.  Moreover, nothing in the record suggests a particularly high interest rate on the note for investment purposes.

The Plaintiffs here argue that the "Defendants sold the Note in an effort to raise capital for general business operations."  That, however, is a manipulation of words.  The Defendants did not sell the note to anyone, nor has Plaintiff alleged any attempt to sell the note.  The Plaintiffs cite a press release by which the acquisition of RMI was

13

announced to the public as evidence that the acquisition, and more specifically the note, was "sold" to the public as a reason for investing in DK.  That argument is too attenuated for this Court to find that DKAI actually sold the note to the public.  Perhaps the note was advertised to the public as evidence that DKAI was committed to economic growth.  Even that, however, would not be sufficient.

Moreover, Plaintiffs argue unpersuasively that the only way they could receive payment under the note was if "DKAI successfully operated its business at a level that could service RMI's debt."  This argument fails under the logic that "the repayment of any loan rests on the business or consumer successfully operating at a level that enables it to service the entity's other priorities." *Eagle Trim, Inc. v. Eagle-Picher Indus., Inc.*, 205 F. Supp. 2d 746, 752 (E.D. Mich. 2002) (performing a *Reves* analysis to find that a mortgage note was not a security, and therefore the plaintiff's claim of securities fraud was invalid).

Regarding the plan of distribution, while it may be true that an instrument of debt can be distributed to only one investor and still be a security, the nature of this note was a commercial transaction and not an investment.  Unlike the note in *Stoiber*, the note here was not issued to multiple parties, and neither party solicited the other in an attempt to raise money for general capital to trade commodities.  The note was "non-negotiable" and was offered to a single party in connection with a specific commercial transaction.  The Court therefore finds that the second factor in the *Reves* analysis favors the conclusion that the note in this case is not a security.

As to the third prong of the *Reves* test, Plaintiffs contend that they acquired what they believed was an investment in a public company subject to SEC filing requirements,

14

and that they were protected by the federal securities laws, and thus, it follows that the public would view the Note as a security issued by DKAI.  The Court is not persuaded by that argument.  Regardless of whether the acquisition was subject to SEC procedural requirements, the facts here would lead the general public to believe the note was a loan, in the commercial borrower/lender context, payable over several years, as partial payment for the sale of a business.  Therefore, if the public perception factor is applicable to this case, it favors Defendants.

On the other hand, the risk reducing factor favors the Plaintiffs because the Note is uncollateralized, uninsured, and not regulated by any statute or agency.  In their original motion to dismiss, the Defendants' argument on this point was limited to a footnote.  In their Reply Memorandum in Further Support of the Motion to Dismiss, the Defendants expanded their argument by asserting the lack of a federal remedy here because Congress did not intend to provide a broad federal remedy for all fraud when enacting the Securities Exchange Act.  There are circumstances, however, under which a federal remedy should be, and is, available to a plaintiff that can satisfy the *Reves* test.

When all four *Reves* factors are considered, the note at issue fails to satisfy the "security" test.  The non-negotiable promissory note arose out of this transaction as a loan for part of the purchase price of the assets of RMI, repayable in equal monthly installments over three years.  Even considering the allegations in a light most favorable to the Plaintiff, this Court concludes that the non-interest bearing promissory note at issue is not a security.  Accordingly, Counts I, II, and III will be dismissed.

Having disposed of the federal claims, the Court turns to 28 U.S.C. § 1367, which provides, in pertinent part:

> (a) ... [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties....
> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction....

In keeping with section 1367, the Court has the discretion to exercise supplemental jurisdiction over the remainder of the claims in the Complaint.

It will, however, decline to do so based, first, on the consideration set forth in section 1367(c)(3), namely, the dismissal of all claims over which the Court had original jurisdiction.  See Figueroa v. Buccaneer Hotel Inc., 188 F.3d 172, 181 (3d Cir.1999).  See also Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir.1995) ("where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so").  In addition, the Court is mindful of the well-settled guidance from the Third Circuit that where there are both federal and state law claims and the federal claims are dismissed, the Court may dismiss the state law claims on jurisdictional grounds and ordinarily should refrain from exercising pendent jurisdiction in the absence of extraordinary circumstances.  University of Maryland at Baltimore v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1540 (3d Cir.1993); Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 196 (3d Cir.1976).

Because Defendants' motion to dismiss Plaintiffs' federal securities claims has been granted, and finding an absence of any "extraordinary circumstances," the Court will not exercise supplemental jurisdiction over the State common law claims in this case.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Complaint for failure to state a claim will be granted as to Counts I, II, and III, and the Court will not retain supplemental jurisdiction over Counts VI or VII.

/S/Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
U.S.D.J.

Dated: July 27, 2006